In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1058

1ST SOURCE BANK,

*Plaintiff-Appellee*,

*v.*

JOAQUIM SALLES LEITE NETO,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:15-CV-261 — **William C. Lee**, *Judge*.

ARGUED MAY 22, 2017 — DECIDED JUNE 26, 2017

Before FLAUM, EASTERBROOK, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. Joaquim Salles Leite Neto is a defendant in parallel civil litigation brought by 1st Source Bank in Indiana and Brazil. Neto sought antisuit injunctive relief in Indiana district court to prevent 1st Source from pursuing its claims in Brazil. The district court denied Neto's motion, and Neto appeals. For the following reasons, we affirm.

## I. Background

In 2009, Neto entered into a trust agreement with Wells Fargo Bank to purchase an airplane for use in his business. Wells Fargo borrowed $6 million from 1st Source and pledged the aircraft as collateral. In January 2011, Neto signed a guarantee for that loan. The guarantee contains the following disputed choice-of-law and venue provisions:

> 3.02 <u>Governing Law</u>. This guarantee shall be governed by and construed in accordance with the laws of the state of Indiana .… In relation to any dispute arising out of or in connection with this guarantee the guarantor [*i.e.*, Neto] hereby irrevocably and unconditionally agrees that all legal proceedings in connection with this guarantee shall be brought in the United States District Court for the District of Indiana located in South Bend, Indiana, or in the judicial district court of St. Joseph County, Indiana, and the guarantor waives all rights to a trial by jury <u>provided however</u> that the lender [*i.e.*, 1st Source] shall have the option, in its sole and exclusive discretion, in addition to the two courts mentioned above, to institute legal proceedings against the guarantor for repossession of the aircraft in any jurisdiction where the aircraft may be located from time to time, or against the guarantor for recovery of moneys due to the lender from the guarantor, in any jurisdiction where the guarantor maintains, temporarily or permanently, any asset. The parties hereby consent and agree to be subject to the jurisdiction of

> all of the aforesaid courts and, to the greatest ex-
> tent permitted by applicable law, the parties
> hereby waive any right to seek to avoid the ju-
> risdiction of the above courts on the basis of the
> doctrine of *forum non conveniens*.

("Section 3.02") (capitalization removed). In June 2012, the Brazilian government seized the airplane. For several years, Neto continued to pay 1st Source for his debt on the plane, making almost $3 million in payments. Neto stopped making payments in December 2014.

In June 2015, 1st Source sued Neto in the Northern District of Indiana to collect the remainder of the debt. 1st Source's amended complaint asserted:

> Venue in the Northern District of Indiana and
> the South Bend Division is proper .... A substan-
> tial part of the events or omissions giving rise to
> 1st Source's claim occurred in St. Joseph County,
> Indiana. Moreover, 1st Source and the Defend-
> ants have contractually agreed that any litiga-
> tion between the[m] must be venued in St. Jo-
> seph County, Indiana. Further, under 28 U.S.C.
> § 1391(c)(3), [Neto] may be sued in any judicial
> district.

The parties conducted some discovery and attempted to resolve the dispute short of trial: 1st Source filed one docu-ment-production request, and Neto traveled to Chicago for a deposition and mediation session related to this dispute and another case not relevant to this appeal. In July 2016, 1st Source filed a substantively similar complaint against Neto in São Paolo, Brazil, seeking to recoup the remainder of the debt

from the airplane transaction. At the time that 1st Source filed the Brazil lawsuit, Neto maintained certain assets, including the airplane at issue, in Brazil. In October, Neto sought antisuit injunctive relief in Indiana district court in an effort to prevent 1st Source from proceeding with the parallel action in Brazil. He argued that § 3.02 of the loan guarantee prohibited 1st Source from bringing suit in Brazil, and that the Brazil litigation was vexatious and duplicative. The district court denied Neto's motion, concluding that § 3.02 allowed for the parallel litigation, and that Neto had not met his burden for showing that the Brazil litigation was vexatious. This appeal followed.

## II. Discussion

On appeal from decisions on injunctive relief, "[w]e review legal conclusions de novo, findings of fact for clear error, and equitable balancing for abuse of discretion." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "Our review of contract meaning is de novo." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 763 (7th Cir. 2010).

### A.  Section 3.02

The personal guarantee between Neto and 1st Source contains an Indiana choice-of-law provision. In Indiana, "courts … interpret a contract so as to ascertain the intent of the parties." *First Fed. Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 603 (Ind. 1990). "When a court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made," unless some equitable reason justifies non-enforcement. *Id.* at 604.

Neto first argues that § 3.02 forbids 1st Source from filing suit in Brazil because giving effect to § 3.02's second clause renders the first clause—which, in Neto's view, limits the venue to Indiana—meaningless. This reading of the loan guarantee is incorrect for two reasons. First, the language of the first clause only applies to Neto, not to 1st Source. It reads: "[T]he guarantor [Neto] hereby irrevocably and unconditionally agrees that all legal proceedings in connection with this guarantee shall be brought in [Indiana]…." Section 3.02 contains no complementary promise on the part of 1st Source to agree to bring "all legal proceedings" in Indiana. On the contrary, § 3.02's second clause plainly gives 1st Source discretion to institute recovery proceedings against Neto wherever he keeps assets: "[T]he lender ... shall have the option … to institute legal proceedings … against the guarantor for recovery of moneys due … in any jurisdiction where the guarantor maintains … any asset." That is exactly what 1st Source did here.

Second, § 3.02's first clause is not rendered meaningless by the second clause, as Neto argues. The first clause grants 1st Source the ability to pursue claims against Neto in Indiana, regardless of where Neto keeps his assets. The second clause allows 1st Source to initiate legal proceedings against Neto wherever his airplane or other assets are located. Thus, the clauses have independent meanings, and giving effect to one does not render the other meaningless. Moreover, the two clauses are part of the same sentence and are connected by the phrase "provided however," meaning the first clause was intended to be read in conjunction with, and not instead of, the second.

Next, Neto argues that § 3.02 may permit a lawsuit in *either* Brazil or Indiana, but not simultaneously in both venues. However, the language of the second clause speaks of "legal proceedings" in the plural, that can be taken "in addition to" legal proceedings in Indiana. And the next sentence in § 3.02 states, "[t]he parties hereby consent and agree to be subject to the jurisdiction of all of the aforesaid courts." This language indicates that the loan agreement contemplated the existence of multiple lawsuits, and Neto points to no language suggesting the opposite. Section 3.02 is much more expansive than, for example, the forum-selection clause—on which Neto relies—in *Galco Food Prods., Ltd. v. Goldberg*, No. CIV.A. 71 C 1201, 1971 WL 16640 (N.D. Ill. July 16, 1971), where the district court did enjoin the defendant from pursuing parallel litigation in Canada. The agreement in that case provided, "In the event either party shall desire any construction, interpretation, direction, or enforcement by a Court, of any of the terms of this agreement, such party may select a Court of proper jurisdiction of its own choosing, whether such Court be in … Ontario or in … Illinois." *Id.* at *2. That agreement's repeated references to "a court," in the singular and the choice between "Ontario *or* … Illinois," *id*. (emphasis added), differ from § 3.02's language, which contemplates "legal proceedings" that can be initiated in other fora "in addition to the [Indiana] courts," and binds the parties to agree to jurisdiction in "all of the … courts," in the plural.

Neto also contends that 1st Source is judicially estopped from arguing that it was permitted to sue in Brazil under § 3.02. He points to 1st Source's amended complaint, which asserted, "1st Source and the Defendants [Neto and Wells Fargo] have contractually agreed that any litigation between them must be venued in St. Joseph County, Indiana." Whether

a party is judicially estopped from making an argument is a question of law subject to de novo review. *United States v. Hook*, 195 F.3d 299, 305 (7th Cir. 1999) (citation omitted). As a preliminary matter, Neto forfeited this judicial-estoppel theory by failing to raise it before the district court. *See Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008) ("[i]t is axiomatic that an issue not first presented to the district court may not be raised before the appellate court as a ground for reversal") (citation omitted). However, because estoppel is designed "to protect the courts rather than the litigants … an appellate court[] may raise the estoppel on its own motion in an appropriate case." *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) (footnote omitted).

There are "certain clear prerequisites" that must obtain before judicial estoppel applies: "(1) the later position must be clearly inconsistent with the earlier position; (2) the facts at issue should be the same in both cases; and (3) the party to be estopped must have convinced the first court to adopt its position." *Hook*, 195 F.3d at 306 (quoting *Levinson v. United States*, 969 F.2d 260, 264–65 (7th Cir. 1992)) (internal quotation marks omitted); *see also New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (citations omitted). Aside from 1st Source's amended complaint, Neto points to no other instance in which 1st Source argued that venue was *only* proper in Indiana. Rather, 1st Source consistently took the unremarkable position that venue was proper in Indiana, but not to the exclusion of all other venues. This does not conflict with the notion that venue could also be proper in Brazil. Furthermore, 1st Source's complaint never "convinced the [district] court to adopt [the] position" that venue was only proper in Indiana. *See Hook*, 195 F.3d at 306 (citation omitted). The first time the venue issue

arose—in briefing on Neto's motion for antisuit injunctive re-
lief—1st Source took the position it maintains on appeal:
Venue was proper in Indiana, Brazil, or *both* under § 3.02.
Thus, a sua sponte finding of judicial estoppel is inappropri-
ate in this case.

Finally, Neto argues that if § 3.02 does authorize suit in
Brazil, then the provision is unenforceable as a matter of pub-
lic policy. However, international forum-selection clauses are
prima facie valid, especially when freely negotiated between
private parties. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1,
10 (1972). While the resisting party can call the agreement's
validity into question if enforcement is "unreasonable" under
the circumstances, *id.*, the Supreme Court has narrowly con-
strued this exception to apply to three concrete circumstances:

> (1) if [the clause's] incorporation into the con-
> tract was the result of fraud, undue influence or
> overweening bargaining power;

> (2) if the selected forum is so gravely difficult
> and inconvenient that the complaining party
> will for all practical purposes be deprived of its
> day in court; or

> (3) if enforcement of the clauses would contra-
> vene a strong public policy of the forum in
> which the suit is brought, declared by statute or
> judicial decision.

*Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 160 (7th Cir. 1993) (citing
*Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991); *M/S Bre-
men*, 407 U.S. at 12–13) (internal brackets, citations, and quo-
tation marks omitted). Neto does not mention fraud or undue
influence, claim that litigating in Brazil would deprive him of

his day in court,[1] or cite to any "statute or judicial decision," *id.*, declaring Indiana's public policy on this issue. Rather, Neto asserts that the clause is unreasonable because it "would permit remote courts around the world to apply differing procedural laws to this case, although the matter involves an Indiana bank and an Indiana Guarantee governed by Indiana law," and would risk piecemeal or inconsistent litigation.

Even construing this assertion as a public-policy argument, it is misleading in several ways. First, § 3.02 does not authorize global jurisdiction over Neto. Rather, the second clause authorizes suit in "in any jurisdiction where the aircraft may be located" and "in any jurisdiction where [Neto] maintains, temporarily or permanently, any asset." Neto thus has the ability to control, through his own conduct, the scope of permissible venues for litigation under § 3.02. Second, while it is true that the case involves an Indiana bank and loan guarantee, it also involves a Brazilian defendant, collateral and other assets located in Brazil, and, insofar as this Court is aware, no attachable assets inside Indiana. It is not unreasonable for a creditor in such a situation to seek to protect its interests by asking loan guarantors to agree to suit in jurisdictions where they hold assets that could be used to satisfy the loan obligations. Regardless, in the absence of a "statute or judicial decision" embodying a "strong public policy" that would be undermined by enforcing § 3.02, *id.*, the parties' otherwise-valid forum-selection clause "should be given full effect." *M/S Bremen*, 407 U.S. at 10.

---

[1] It would be difficult for Neto to take this position, since he resides in São Paolo.

### B. Antisuit Injunction

Neto next argues that, even if § 3.02 authorizes the Brazil lawsuit, an antisuit injunction is nevertheless appropriate because the Brazil suit is vexatious and duplicative of the Indiana action. Other circuits to address the issue have determined that the standard for antisuit injunctive relief differs in some respects from the traditional preliminary-injunction standard, most notably in that the antisuit-injunction test does not rely on a showing of likelihood of success on the merits. *See, e.g.*, *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 991 (9th Cir. 2006) (a movant "need not meet our usual test of a likelihood of success on the merits of the underlying claim to obtain an anti-suit injunction"; instead, a movant "need only demonstrate that the factors specific to an anti-suit injunction weigh in favor of granting the injunction"). Factors specific to the propriety of antisuit injunctive relief include, "whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined." *Id.* (citation omitted). If both factors are met, the district court must then ask whether "letting the two suits proceed would be gratuitously duplicative, or as the cases sometimes say 'vexatious and oppressive.'" *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir. 1993) (citation omitted).[2] It follows that "[t]he mere filing of a suit in one forum does not cut off the preexisting right of an independent

---

[2] This standard is "laxer," *Allendale*, 10 F.3d at 431, than one requiring a showing of "irreparable miscarriage of justice." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984). Although we have inclined towards the laxer standard, *see PhilipsMed. Sys. Int'l B.V. v. Bruetman*, 8 F.3d 600, 605 (7th Cir. 1993), we need not decide which applies, as Neto does not meet either.

forum to regulate matters subject to its prescriptive jurisdiction." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984). Finally, because an "antisuit injunction operates to restrict the foreign court's ability to exercise its jurisdiction as effectively as if it were addressed to the foreign court itself," *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 630 (5th Cir. 1996) (citation omitted), a district court should issue an international antisuit injunction only when the interest in avoiding vexatious litigation outweighs the international-comity concerns inherent in enjoining a party from pursuing claims in a foreign court. *See Rosenbloom v. Barclays Bank PLC*, No. 13-CV-04087, 2014 WL 2726136, at *2 (N.D. Ill. June 16, 2014).

Neto correctly notes that the parties and issues are substantively the same between the Indiana and Brazil lawsuits. The complaints in each action seek recovery of the same debt arising from the aircraft transaction. 1st Source argues that the cases are sufficiently different because the Brazilian courts, unlike the district court, offer prejudgment attachment of Neto's assets. However, this difference is one of procedure, and does not give rise to a different legal issue. *See E. & J. Gallo Winery*, 446 F.3d at 991 (antisuit injunction is only appropriate where "the parties and the *issues* are the same") (emphasis added). We have already recognized that the availability of different remedies is insufficient to create a substantive difference between otherwise-similar cases. *See Allendale*, 10 F.3d at 429 (affirming an antisuit injunction despite differing damages limits in the United States and France); *see also Affymax, Inc. v. Johnson & Johnson*, 420 F. Supp. 2d 876, 885 (N.D. Ill. 2006) ("the potential issuance of a European patent does not change the fact that the legal issues in the two cases are the same").

With respect to vexatiousness,[3] the district court reviewed the two actions and concluded, "1st Source's conduct in filing suit in Brazil could at worst be characterized as heavy handed. Neto presents nothing to establish that 1st Source's conduct rose to the level of vexatiousness or oppressiveness, even if the express language of Section 3.02 is taken out of the equation." As noted above, 1st Source first filed suit in Indiana, and then subjected Neto to one production request, one deposition, and one mediation session in the United States before filing suit in Brazil. Given these minimally burdensome discovery proceedings, the district court did not abuse its discretion in concluding that Neto had failed to demonstrate that 1st Source's actions were either vexatious or oppressive.[4]

On appeal, Neto does not present anything more than what he presented to the district court. There is no indication in the record of the expenses Neto has incurred with respect to either litigation. Other than Neto's unsupported conclusion that he has spent "a great deal of time and money litigating this case," there is no indication that the parallel Brazil action has been particularly oppressive. The record does not show

---

[3] Neto did not adequately develop an argument as to "whether or not the [Indiana] action is dispositive of the action to be enjoined," *E. & J. Gallo Winery*, 446 F.3d at 991. Neto cited to no legal authority—American, Brazilian, or otherwise—for the proposition that a decision in federal district court would have preclusive effect in the Brazilian courts. We need not address the issue, however, given our conclusion below that the district court did not abuse its discretion in finding no vexatiousness.

[4] Because the district court did not find the Brazil lawsuit to be vexatious, it had no occasion to balance the competing interest in preserving international comity.

much more than "[t]he mere filing of a suit in [another] forum," which is insufficient to justify an antisuit injunction. *Laker Airways*, 731 F.2d at 926; *see Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349, 1357 (6th Cir. 1992) ("If we were to hold that duplication of parties and issues is a sufficient basis for the issuance of a foreign antisuit injunction, parallel proceedings would never be permitted because by definition such proceedings involve the same claim and therefore the same parties and issues."). On the contrary, § 3.02 authorized 1st Source to initiate the very litigation Neto seeks to avoid, and 1st Source had legitimate reasons to file suit in Brazil—it wanted to protect its interest in recouping the debt Neto owes by suing in a forum that permits prejudgment attachment of assets. 1st Source's exercise of its contractual rights to protect its interests was a non-vexatious reason for pursuing parallel litigation in Brazil, so antisuit injunctive relief was not appropriate.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.